UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
CHEVONNE SIUPA,                     )
                                    )
         Plaintiff,                 )
                                    )
v.                                  )   Civil Action No. 10-10525-LTS
                                    )
ASTRA TECH, INC., et al.,           )
                                    )
         Defendants.                )
_____ )


ORDER REGARDING DEFENDANTS' MOTION FOR
SANCTIONS AND SCHEDULING HEARING TO SHOW CAUSE

October 31, 2012

SOROKIN, C.M.J.

The history of this case is unnecessarily long and unusually tortured. Over the past two years, the relationship between counsel for the plaintiff and counsel for the defendants has grown increasingly turbulent, necessitating the Court's intervention to resolve even the most minor disputes. The extent to which things have devolved is evidenced by the Court's most recent order delineating what materials may be placed on conference tables during depositions. See Doc. No. 82.

The subject of this Order is more troubling. An October 24, 2012 status conference was scheduled at the request of the plaintiff's attorney, Jeffrey F. Ryan, for the purpose of addressing the parties' inability to resolve deposition scheduling issues. See Doc. Nos. 76-77. That conference, however, transformed into an evidentiary hearing when defense counsel made an oral motion for sanctions based on serious allegations of misconduct by Mr. Ryan earlier that day

during the plaintiff's deposition. It is that motion which the Court now ALLOWS, after careful consideration, for the reasons that follow.

I.    BACKGROUND

The current dispute cannot be fairly assessed without recalling certain relevant conduct by Mr. Ryan since his entry in the case via pro hac vice admission a year ago.[1]  See Doc. No. 38. Four specific incidents merit discussion here.

  A.    Amending the Complaint

A month after Mr. Ryan entered his appearance, he sought to amend the complaint.[2] He conferred with defense counsel regarding his proposed revisions and obtained the defendants' assent to a draft version of an amended complaint. Doc. No. 42-2 at ¶ 4.  Thereafter, Mr. Ryan filed an Assented-To Motion for Leave to File an Amended Complaint, Doc. No. 42, to which he attached the First Amended Complaint he had discussed with defense counsel, Doc. No. 42-1. The Court allowed his Motion on November 30, 2011, and directed that "Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted." Electronic Order dated 11/30/2011. Mr. Ryan docketed a document entitled "First Amended Complaint" the same day. Doc. No. 43.

The version of the amended complaint Mr. Ryan filed, however, differed from the

---

[1] Mr. Ryan is a member of the California bar. Doc. No. 38-1. The plaintiff previously was represented by Michael Karcis, a lawyer from Massachusetts who moved for Mr. Ryan's admission pro hac vice and remains in the case now as Mr. Ryan's local counsel. Doc. No. 38. Although various procedural complications arose in this case before Mr. Ryan's appearance, see, e.g., Doc. Nos. 14, 26, they have not influenced the Court's resolution of the pending motion.

[2] The plaintiff originally instituted this action in Massachusetts state court in February 2010. Doc. No. 1-1.

document he shared with defense counsel and submitted to the Court with his motion to amend in one respect: it demanded a jury. Compare Doc. No. 42-1 (containing 48 paragraphs and no explicit jury demand in the caption), with Doc. No. 43 (containing 49 paragraphs and adding a jury demand to the caption); see also Doc. No. 53. This incident was significant because Mr. Ryan chose to attempt to make this material change by disobeying a Court order and by attempting to deceive both counsel and the Court. Had Mr. Ryan notified defense counsel of the change and requested the Court's permission to file the amended complaint containing a jury demand, the issue likely would have been resolved less contentiously and with less motion practice, as the Court ultimately permitted the change on the merits. See Doc. Nos. 53-54, 57, 66-67.

The Court addressed Mr. Ryan's behavior at a hearing. At the time, based upon Mr. Ryan's statements to the Court, the Court was "satisfied that such conduct will not recur either intentionally or inadvertently." Accordingly, the Court took no further action at that time.

B.     July 2012 Order on Discovery Motions

On July 17, 2012, this Court issued an Order resolving four motions to compel, two filed by the plaintiff and two by the defendants. See Doc. No. 62. At that time, paper discovery except for certain items specifically addressed in the Order   was complete. Id. at 4. The Court stated: "***With the exception of deposition notices*** (or subpoenas to depose third parties which (***unlike deposition notices***) may include requests for documents from these third parties), ***no party may serve a discovery request without prior leave of Court***." Id. (emphasis added).

Nevertheless, nearly a month after docketing of that Order, Mr. Ryan served an "Amended Notice of Deposition" on defendant Joe Johnson, via defense counsel, which

3

purported to "command[]" production of documents "listed on Schedule A." Doc. No. 80-1 at Ex. 14. "Schedule A" consisted of three pages containing twenty-seven document requests. Id. Mr. Ryan did not seek leave of this Court, as required by the July 17, 2012 Order, before propounding these Rule 34 requests.[3] Instead, he served the notice and placed the onus on defense counsel to prepare objections thereto.

  C. <u>October 21, 2012 Request and Exhibits</u>

On October 21, 2012, Mr. Ryan requested an expedited hearing to resolve a dispute between counsel regarding the scheduling of a deposition of one of defendant Astra Tech's employees, Tenley Hart. Doc. No. 76. In his request, Mr. Ryan sought only an order compelling defense counsel to produce Ms. Hart for a three-hour deposition sometime during the week of October 22, 2012. See id. at 1. Such a request necessarily required some degree of factual support to demonstrate context, including the nature of communications between counsel regarding deposition scheduling and any efforts made to secure the appearance of Ms. Hart. Two exhibits Mr. Ryan submitted in support of his request, however, went far afield from such limited, pertinent matters.

First, Mr. Ryan submitted a September 21, 2012 declaration from a witness who claims to

---

[3]Mr. Ryan explained during the October 24, 2012 conference that the inclusion of "Schedule A" was an oversight that arose because he had instructed his administrative assistant to amend an earlier deposition notice for Mr. Johnson served before the July 17, 2012 Order and he had not thought to delete the reference to Schedule A or detach it from the notice before serving it. According to defense counsel, though, Mr. Ryan opted not to voluntarily remedy the oversight when it was brought to his attention informally before formal objections were prepared.
 Another deposition notice served in August 2012 also included document requests. See Doc. No. 80-1 at Ex. 14. Although that witness defendant Astra Tech's human resources manager is not named as a party, she is a party representative. Mr. Ryan served a notice of her deposition rather than a third-party subpoena. The inclusion of document requests in her notice, without leave of this Court violates at least the spirit of the July 17, 2012 Order as well.

know about Mr. Johnson's relationship with, and favorable treatment of, Ms. Hart.  See Doc. No. 76-2 at Ex. D.  The declaration has, at best, only tangential relevance to the request Mr. Ryan made of this Court.  He solicited it in an attempt to provide defense counsel with independent "nonparty" evidence "substantiating Plaintiff's claim that Ms. Hart and defendant Joe Johnson were having a romantic affair at times critical to [his] client's case," Doc. No. 76-1 at ¶ 4, which he hoped would persuade defense counsel to produce certain documents sought from Ms. Hart, Doc. No. 76-2 at Ex. C.  His request to this Court, however, does not include a motion to compel production of any such documents.  See generally Doc. No. 76.

To the extent that any of the rather tangential statements in the declaration relate to the issue Mr. Ryan raised before this Court, the final two paragraphs have no probative value at all.  In them, the declarant accuses defense counsel of employing extreme, dishonest tactics to investigate the basis for the declarant's request to reschedule a state administrative proceeding.  See Doc. No. 76-2 at Ex. 3, ¶¶ 10-11.  These implausible allegations have nothing to do with the scheduling of Ms. Hart's deposition.[4]  They present multiple levels of hearsay, and relate to incidents which supposedly took place nearly a year ago in connection with a completely different proceeding in a different forum.  There is no reason, then, that such a document should have been included in support of a request to set a date for a three-hour deposition.

Mr. Ryan's exhibits contain a second document that includes a similarly personal and equally irrelevant attack that should have been left unsaid.  As Exhibit E to his request, Mr. Ryan attached a string of emails culminating in a message to defense counsel in which Mr. Ryan

---

[4] Nor do they have anything to do with the document production issue Mr. Ryan claims was the basis for soliciting the declaration in the first instance.

referred to the witness he wishes to depose as "Tenley ███████ Hart." Doc. No. 76-2 at Ex. E [*phrase removed pursuant to Doc. No. 126*]. The exhibit ostensibly was offered for the substance of the email preceding Mr. Ryan's — a message from defense counsel informing Mr. Ryan she represented Ms. Hart, and directing that communication with Ms. Hart should occur through counsel. Id. As such, it is difficult to imagine why Mr. Ryan included his response, name-calling and all, in his publicly-filed submission to this Court.

   D.  Settlement Communications

   Finally, in advance of the October 24, 2012 hearing, defense counsel responded to Mr. Ryan's request and also brought various other issues to the Court's attention. See Doc. No. 79. One issue was defense counsel's contention that Mr. Ryan "has abused the privilege of appearing *pro hac vice* in this district, . . . treating deposition scheduling as an opportunity for ad hominem attacks on Defendants' counsel, witnesses in the case, and parties to the litigation, and engaging in unprofessional behavior not usual in this district." Id. at 5. As an example of such behavior (in addition to the above-enumerated examples), defense counsel cited a recent email from Mr. Ryan (subsequently withdrawn) in which he stated his mistaken belief that the wife of defendant Astra Tech's president is a prominent heiress, and, in connection with a settlement demand, threatened to publicize her connection to a company where women are "mistreat[ed] and abuse[d]." Doc. No. 80-1 at Ex. 16; see Doc. No. 79 at 5 n.5. Such comments are troubling not only because they apparently were made carelessly, based on inaccurate information, but also because they were aimed at an individual who is not involved in this case. See Mass. Rules of Prof'l Conduct R. 4.4 (requiring lawyers to "respect . . . rights of third persons," and prohibiting tactics "that have no substantial purpose other than to embarrass . . . a third person . . . .").

II.     ALLEGED MISCONDUCT

It is against this backdrop that the Court considers the allegations of misconduct by Mr. Ryan during his client's deposition that were the focus of the October 24, 2012 motion hearing.

A.     The Transcript

Just after 9:30 a.m. on the day of the hearing, the parties met at defense counsel's office in Boston for the plaintiff's deposition. About thirty minutes into the deposition, the plaintiff was reviewing her interrogatory responses and answering a question asked by defense counsel.[5] See Doc. No. 81 at 4-5. Defense counsel interjected, and the following exchange took place:

> [Defense counsel]: I would like the record to reflect Mr. Ryan is writing notes to his client while she is answering a question. ***If he wishes to prove that's not true rather than going on a rampage, he can turn back over the notepad that he just turned over, and he can show us all what he wrote on it.*** But I will, again, be bringing up to the court that he was writing on a notepad. ***And when I looked at him, he turned it over.*** It was clear that M[s]. Siupa's eyes were looking at the notepad as well.
>
> Mr. Ryan: Nothing that [defense counsel] said in that last statement was accurate. ***100 percent false.***
>
> [Defense counsel]: Then I would request that you bring that notepad to the court and let the court look at it.
>
> Mr. Ryan: ***There is no notepad that has been turned over.*** It is 100 percent false.
>
> [Defense counsel]: You are stating right now that there is no notepad right there

---

[5]At the hearing, defense counsel argued the plaintiff had been "fumbling" for an answer to the pending question, which involved the date on which the plaintiff had received a certain document. The transcript of the deposition suggests this is a fair representation. Defense counsel asked: "Is there any reason why you did not mention [in your interrogatory response] that you had received [Exhibit 52] in May of 2008?" Doc. No. 81 at 4. The time stamps reveal the plaintiff spent at least one full minute giving this response: "Absolutely. I very well could have received the document October 2009 — or what are we? Yes. This — here we go. My second file request for my complete and unedited personnel was in October of — that was in 2008. One moment. This has to be October 2008. That's why —" Id. at 4-5.

7

on a binder between you and Ms. Siupa that is turned over?

Mr. Ryan: ***This notepad has been turned over since the start of the deposition.*** It contains the address of the courthouse. I looked it up on Google because we have to go there at 4:15. Could we please move on. You have your record. I have made mine.[6]

[Defense counsel]: Ms. Siupa, you are under oath. You understand that, correct?

[Plaintiff]: I do.

[Defense counsel]: Did Mr. Ryan just turn that notepad over within the last 5 minutes?

[Plaintiff]: ***The notepad has been flipped over and reflipped over.*** I don't know, because I was concentrating on this document. I saw something in my peripheral vision. I have been concentrating on your questions. . . .

\*    \*    \*

Mr. Ryan: There's two pads. So let the record reflect that there are two pads. The question is vague and ambiguous as to which pad she is referencing.

[Defense counsel]: As I said, I will want an immediate transcript. . . . And I will say, as I did, if you wish to prove it to the court, the notepad is there, and you may bring it to show the court what you were writing.

\*    \*    \*

[Defense counsel]: And I am going to ask that this pocketbook be removed from the table.

Mr. Ryan: ***The request is denied.***

[Defense counsel]: Well, I will move it, and you can take it up with the judge.

[Plaintiff]: Please don't touch my purse again.

---

[6]Of course, this statement is incorrect. Mr. Ryan had not made his "record," as he neither displayed the pad to those present, nor did he mark it at that moment as an exhibit as part of the deposition, nor did he place it in a sealed envelope for preservation pending submission to the Court.

> [Defense counsel]: We are going to cease this deposition, and I am going to call the court. We are off the record now.

Id. at 5-10 (emphasis added). During the course of the above interchange, Mr. Ryan chose not to turn his pad over, chose not to mark it as an exhibit, and chose not to agree to move the pocketbook obscuring defense counsel's view of any possible notes handed by Mr. Ryan to the witness. After a recess that lasted approximately forty minutes, Mr. Ryan asked to make a statement on the record. Among other things, he said: "And I am prepared to show the judge the notepad, which, as I accurately stated, only contains the information about the address of the courthouse which we're going to . . . later today . . . ." Id. at 11.

The deposition remained suspended until the parties appeared before this Court for their conference later that afternoon.

    B.    Counsels' Assertions

At the conference, after this Court had addressed deposition scheduling and various other discovery disputes, defense counsel made an oral motion for sanctions based on Mr. Ryan's conduct during his client's deposition. She repeated the allegations she made on the record during the deposition — that Mr. Ryan had written a note to his client during her testimony, his client had appeared to look at it, and that Mr. Ryan had then flipped his legal pad over when he noticed defense counsel looking at him. Defense counsel also noted Mr. Ryan had denied doing any of those things, and that she had subpoenaed the court reporter — the only independent party present during the deposition — to testify about her own observations.

Claiming to be "shocked and appalled," Mr. Ryan denied the allegations and repeated his assertion that the legal pad contained only the address for the courthouse. Indeed, he held up a legal pad with the courthouse address written at the top of the first page, claiming it was the same

9

legal pad that had been on the table during the deposition. Despite initially denying that he flipped anything over (as reflected in the transcript excerpt above), Mr. Ryan eventually admitted during the hearing that he *had* turned his legal pad face-down during the deposition. When asked why, if his statements were true, he had not simply shown the legal pad to defense counsel at the moment she made her accusation, Mr. Ryan responded that defense counsel had not asked to see it. He claimed: "All [defense counsel] had to do was ask. I'd have handed it to her." Unfortunately for Mr. Ryan, the record establishes that, in fact, defense counsel *did* ask. Doc. No. 81 at 5 ("If he wishes to prove that's not true, . . . he can turn back over the notepad that he just turned over, and he can show us all what he wrote on it.").

As to the plaintiff's purse, the parties agreed it had been placed on the conference table between defense counsel and Mr. Ryan during the deposition. The parties also agreed that defense counsel had a large binder propped up on the table between herself and the purse. The Court viewed the purse, which was quite large (perhaps a foot high when setting on the table, and well over a foot in length). When asked why he "denied" defense counsel's request to move the purse and permit an unobstructed view of the area in front of Mr. Ryan and his client, Mr. Ryan's only response was that defense counsel's binder would have been in the way in any event. He also accused defense counsel of "staging" the entire incident.[7]

---

[7]Mr. Ryan was often vituperative in his characterizations of defense counsel. During the hearing, he accused her of "storming" out of the deposition and "slamming" the plaintiff's purse on the table, among other things. This attitude is reflected in many of counsels' email exchanges that have been submitted to the Court in connection with the recent discovery disputes. In his messages, for example, Mr. Ryan has baselessly accused defense counsel of scheduling depositions "so [she] can sleep in," of being "unethical" and "foolish," and of lacking jury trial experience. See Doc. No. 80-1 at Ex. 16.

C.     Hearing Testimony

The court reporter who transcribed the deposition and was present during the incident appeared in court, was placed under oath, and testified about her observations.[8] Her testimony is summarized as follows. Just before defense counsel interrupted the deposition as excerpted above, the court reporter saw Mr. Ryan write something on a legal pad and push it closer to the plaintiff. The court reporter did not read what he wrote, and did not see whether the plaintiff looked at it. Mr. Ryan then flipped his legal pad over, so that the side with the writing faced the table. At that point, defense counsel stated her accusation, which the court reporter continued to record.

Perhaps most critically, when the parties went off the record, the court reporter saw Mr. Ryan take the legal pad he had flipped over and leave the room for somewhere between thirty seconds and a minute. When he returned, she saw him hold the legal pad up and say something like, "here it is, if you want to see it." The court reporter could not say whether defense counsel, who was taking pictures of the table and the objects on it in anticipation of the hearing, saw or heard Mr. Ryan. The court reporter did, however, notice that the top sheet of the legal pad was different when Mr. Ryan brought it back into the room than it had been when she saw him write on it at the table. Before he flipped the legal pad over during his client's testimony, the top page contained two pieces of writing: one at the top, where the courthouse address was on the page Mr. Ryan showed the Court, and which had been written there before the incident at issue; and one further down the page, which the court reporter had seen Mr. Ryan write just before pushing

---

[8]Although a formal transcript has not been completed, the Court has listened closely to the audio recording of the arguments and testimony presented during the October 24, 2012 hearing.

the legal pad toward his client and then flipping it over. The latter piece of writing was no longer on the legal pad when Mr. Ryan brought it back into the conference room (or when he showed it to the Court).

The plaintiff also testified during the evidentiary hearing. She described the positions of the parties around the table, estimating that the court reporter had been about six feet away from Mr. Ryan. She said she did not look at anything on Mr. Ryan's notepad during her testimony, although she did notice that he flipped it over just before defense counsel made her accusation. She did not see what, if anything, Mr. Ryan took out of the room after the accusation was made, because she was "taken aback" by the argument between counsel and the incident with her purse. She did testify, however, that Mr. Ryan flipped the legal pad back over before he left the room and showed her that the courthouse address was written on it.

III.   FINDINGS

   A.   Mr. Ryan's Misconduct

The Court has reviewed and considered all of the testimony and argument presented during the October 24, 2012 evidentiary hearing, and makes the following findings.

First, the court reporter's testimony was wholly credible. Her demeanor demonstrated she was understandably reluctant to be drawn into a dispute such as this one, and showed she appreciated the seriousness of the issue being raised. The content of her testimony had the "ring of truth." It was consistent with both defense counsel's proffer and the transcript of the deposition. She also candidly conceded what she did not know, such as the words appearing on the legal pad. Although Mr. Ryan suggested the court reporter was motivated to testify in support of defense counsel's motion because she "does a lot of work" for defense counsel's firm,

there is no evidence in the record supporting that assertion (or showing there is any reason to doubt the court reporter's truthfulness).

Second, although the plaintiff's testimony also was credible, it did not undermine the court reporter's description of the facts most critical to defense counsel's motion. The plaintiff agreed Mr. Ryan had flipped a legal pad over before defense counsel raised her concern (despite Mr. Ryan's "100 percent" denial reflected in the deposition transcript). Although the plaintiff said Mr. Ryan showed her the legal pad, and that it was the same then as it was when he showed it to the Court, her demeanor reflected that her answer was tentative, and she already had admitted she was under stress at the time based on the manner in which her deposition was suspended. As such, the Court resolves any conflict between her testimony and that of the court reporter by relying on the court reporter, who was credible, calm, and impartial.

Third, Mr. Ryan wrote something on his legal pad while the Plaintiff struggled to answer a question, pushed the pad toward his client, and then flipped it over to shield it from defense counsel's view. Immediately thereafter, Mr. Ryan failed to do what the Court would expect a lawyer to do in this circumstance: (1) either show the legal pad to defense counsel when she stated her beliefs, or place the pad in a sealed envelope (if, for instance, it contained privileged information), taking steps to memorialize either action on the record during the deposition; and (2) accede to defense counsel's reasonable request to move his client's purse from the center of the table. Instead, Mr. Ryan, in a patently false statement, denied having taken the actions defense counsel (and the court reporter) had witnessed. When the deposition was temporarily suspended, he took the legal pad, left the room, somehow disposed of the relevant writing, and returned. He later made another false statement on the record, before the parties left defense

counsel's conference room, regarding the content of the writing on the legal pad.

Fourth, at the hearing before this Court, Mr. Ryan again falsely denied his actions and knowingly presented as evidence a legal pad that he had intentionally altered.

Fifth, Mr. Ryan's conduct violated the Massachusetts Rules of Professional Conduct regarding candor toward the tribunal, fairness to opposing parties and counsel, and truthfulness in statements to others. See Rule 3.3(a)(1) & (4); Rule 3.4(a) & (b); Rule 4.1(a). Mr. Ryan's primary defense to his refusal to show defense counsel the legal pad and to move the plaintiff's purse is to cast aspersions on defense counsel, explaining: "I was deeply offended, especially given her conduct in the other . . . depositions, which included talking to witnesses when questions were pending, whispering in their ears what the answers should be." This, however, is no defense. Even if his statements were true, his adversary's improper conduct would not give him license to follow suit. Further, there is no evidence before the Court in connection with this motion, or elsewhere on the docket that defense counsel engaged in such flagrant misconduct. Moreover, it is wholly incredible that any lawyer would blatantly whisper answers in a witness's ear during a deposition, in full view of opposing counsel, as Mr. Ryan alleges. It is similarly incredible that any lawyer would stand by and watch such behavior repeatedly, throughout thirty-five hours of depositions, as Mr. Ryan alleges without bringing it to the Court's attention.

Sixth, this Court exercised its discretion in granting Mr. Ryan's request for admission pro hac vice, and is empowered to exercise its discretion to revoke such permission. See Local Rule 83.5.3(b); Pease v. Burns, 679 F. Supp. 2d 161, 164-65 (D. Mass. 2010); see also United States v. Panzardi Alvarez, 816 F.2d 813, (1st Cir. 1987) (district courts "must be able to regulate the

14

conduct of attorneys who practice before" them, including on a pro hac vice basis).

Finally, there is no basis to conclude the plaintiff's testimony was, or will be, tainted by whatever Mr. Ryan wrote on his legal pad.

B.  Sanctions

To address Mr. Ryan's violations of the Rules of Professional Conduct, the Court hereby imposes the following sanctions:

1.  Fees and costs shall be awarded against Mr. Ryan for defense counsel's time and efforts spent litigating the oral motion arising from Mr. Ryan's deposition misconduct, and for the court reporter's time on the day of the deposition and hearing as well.[9] To that end, defense counsel shall submit a document itemizing such fees and costs to the Court by the close of business November 9, 2012.

2.  Defense counsel shall be permitted to depose the plaintiff for two full days (i.e., fourteen hours of deposition time), without deducting any of the time spent during the aborted October 24, 2012 deposition.

3.  Mr. Ryan shall bear the expense of videotaping the portion of the plaintiff's deposition that already occurred (on October 25, 2012).

4.  Mr. Ryan shall bear the expense of videotaping any depositions conducted from now until the status of his pro hac vice admission is resolved, see Section III.C infra.

C.  Order to Show Cause

Mr. Ryan shall show cause why the Court should not revoke his pro hac vice admission to

---

[9] Such fees and costs shall be paid by Mr. Ryan alone, **and in no way shall be borne by his client.**

15

practice in this district as a sanction for the serious misconduct discussed above.  Mr. Ryan shall make this filing by the close of business **November 14, 2012**.  Mr. Ryan shall provide the plaintiff with copies of this Order and his response to it.

If either party wishes for the depositions in this matter (scheduled pursuant to this Court's separate electronic order issued today) to be suspended pending resolution of the status of Mr. Ryan's pro hac vice admission, they must file a written request with the Court no later than noon (12:00 p.m. EST) on Monday, November 5, 2012.  Such requests shall be limited to three (3) pages in length.

                        SO ORDERED.

                        /s / Leo T. Sorokin
                        UNITED STATES MAGISTRATE JUDGE