UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                            )
CHEVONNE SIUPA,                                )
                                                            )
                   Plaintiff,                          )
                                                            )
v.                                                           )          Civil Action No. 10-10525-LTS
                                                            )
ASTRA TECH, INC., et al.,                       )
                                                            )
                   Defendants.                       )
_____)


MEMORANDUM AND ORDER ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT


September 10, 2013


SOROKIN, C.M.J.

       In this garden-variety employment discrimination case, which has been winding its way

on an exceedingly tumultuous path through the litigation process for well over three years, the

defendants have sought summary judgment.  Doc. No. 147.  The plaintiff has opposed the

motion, the issues have been briefed, and the Court has heard oral argument.  Doc. Nos. 156,

163, 164, 168, 173, 174.  After careful consideration, and for the reasons that follow, the

defendants' motion is ALLOWED.

I.    MATERIAL FACTS[1]

Astra Tech, Inc. ("Astra Tech") produces and markets dental implant components.[2]  Doc.

No. 149 at ¶ 1.  The plaintiff, Chevonne Siupa, was hired by Astra Tech as a sales representative

– called a "district manager," or "DM" – in Florida in August 2005.  Id. at ¶ 2.  Defendant Joe

Johnson has been a regional manager ("RM") for Astra Tech, assigned to supervise the DMs

---

[1]The defendants submitted a carefully crafted Statement of Undisputed, Material Facts in
support of their motion.  Doc. No. 149.  When she filed her opposition brief, Siupa failed to
respond to the defendants' statement of facts as required by Local Rule 56.1.  Rather than
deeming all of the defendants' facts admitted and undisputed for purposes of this motion – as the
Local Rule plainly permits – the Court extended to Siupa an opportunity to file a response after
the motion hearing.  Siupa has done so, and the Court has considered her submission.  Doc. No.
173.

The Court notes, however, that in several instances Siupa's response to a given fact is to
object, on grounds such as: "Ms. Siupa and counsel have no way to know the truth of this
statement."  See id. at ¶¶ 25, 44, 45, 49, 70-72, 74-78.  Each of the defendants' assertions is
supported by a citation to the record, which is in Siupa's possession.  Moreover, Siupa had
ample opportunity during the course of discovery to obtain the information necessary to evaluate
such statements, which are about subjects relevant to this action.  The Court will deem each of
these statements admitted for purposes of the pending motion.

In other instances, Siupa's explanation for calling a fact "disputed" appears unrelated to
the fact at issue.  E.g., id. at ¶ 4 (recounting a 2007 incident in response to an assertion regarding
concerns about Siupa's performance in early 2006); see also id. at ¶¶ 5, 12, 50.  Also, although
Siupa claims certain facts are disputed, several of her responses do not, in fact, conflict with the
defendants' assertions.  E.g., id. at ¶ 19 (the fact that Cyr did not specify to Siupa what action
was taken against other employees does not refute the fact that he took such action and informed
Siupa that her complaint was sustained); see also id. at ¶¶ 14-16, 24, 27, 28, 30, 39, 41, 47, 48,
60, 64-66, 68.  Some of the defendants' assertions are obviously factual, as well as material,
despite Siupa's suggestions to the contrary.  E.g., id. at ¶ 5 (the use of the phrase "to the effect"
in describing a comment, rather than directly quoting the alleged comment, does not render this
assertion "not a fact"); see also id. at ¶¶ 6, 13, 21, 63.  And at times, Siupa quibbles with
immaterial details.  E.g., id. at ¶¶ 1, 2 (disputing the precise name of the corporate defendant).
The Court will accept the defendants' statement of each of these categories of facts as well.

Where facts truly are in dispute, the Court will view them – and draw reasonable
inferences from them – in the light most favorable to Siupa.

[2]In 2012, the company was acquired by Dentsply Implants.  Because all relevant
documents refer to Astra Tech, and because the events at issue transpired long before the name
changed, the Court will refer to the company as Astra Tech for purposes of this motion.

working in Florida, since January 2006.  Id. at ¶ 3.  Astra Tech hired defendant Steve Cyr as the

Director of its Human Resources Department in March 2006.  Id. at ¶ 4.

During all relevant time periods, Astra Tech's Anti-Harassment Policy ("the Policy")

defined "sexual harassment" with reference to Massachusetts law.  See Doc. No. 148-1 at 1.  It

listed "examples of conduct which may constitute sexual harassment," including "sexual

epithets, jokes, written or oral references to sexual conduct, gossip regarding one's sex life,

comment on an individual's body, [and] comment about an individual's sexual activity,

deficiencies, or prowess."  Id.  The Policy further provided:

> If a supervisor or manager becomes aware of any allegation of harassment of any
> type, the President/CEO or the Director of Human Resources should be contacted
> **immediately** so that a prompt and impartial investigation can begin.  Managers
> should not proceed to conduct an investigation on their own or attempt to resolve
> the situation without reporting it to the President/CEO or Human Resources first.
> These guidelines are provided for information, with the intent that investigations
> of harassment will be conducted with guidance from those with experience in
> these matters.  Every claim of harassment requires a prompt and thorough
> investigation.

Id. at 2 (emphasis in original).  It went on to describe the process for reporting harassment and

filing complaints, and to provide information about the investigation and disciplinary action

processes.  Id.  Siupa received and signed a copy of the Policy on September 1, 2005.  Id.

Johnson first encountered problems with Siupa in 2006, when she skipped a portion of a

required new-hire training program, and created tension with Johnson and distractions among

DMs in her region regarding the manner in which accounts and territories were assigned.  See

Doc. No. 148-2; see also Doc. No. 148-3 (reflecting additional problems after a June 2006

national sales meeting, including concerns that Siupa was questioning and undermining

Johnson's management decisions in conversations with other DMs and engaging in disruptive

and inappropriate behavior).  As a new RM, Johnson reported the issues to his manager and to Human Resources, seeking guidance on how he should address them with Siupa, ultimately doing so via conversations and emails.  See Doc. Nos. 148-2, 148-3, 148-5.

In January 2007, at an Astra Tech event, a DM from North Carolina invited Siupa and Alexandria Duke, another Florida DM, to his room to use narcotics and also made a comment about Duke's breasts.  Doc. No. 173 at ¶ 4; see Doc. No. 156 at 21.  Soon thereafter, Duke reported the incident to Johnson, telling him Siupa was present and also was offended; Johnson never contacted Siupa to discuss it.  Doc. No. 173 at ¶ 4; see Doc. No. 163-1 at 7.  This was the first report by anyone alleging sexual harassment witnessed by Siupa.  See Doc. No. 173 at ¶ 5.

Carl Uthus, an Astra Tech Vice President of Sales, contacted Johnson in the summer of 2007 with concerns about Siupa's sales performance, which was "well below expectations" in June and July 2007, and he asked Johnson to work with Siupa to resolve the issues.  Doc. No. 148-7.  In August of 2007, Siupa reported to Johnson rumors she had heard that another Florida DM, Ellen Walsh, was sleeping with one or more customers.[3]  Doc. No. 173 at ¶ 5; see Doc. No. 156 at 21.

Astra Tech held a national sales meeting in Boston in October 2007.  Doc. No. 148-8.  At a sales team dinner on October 19th, a Florida DM named Patrick Francis made a sexual

---

[3]The record contains no evidence that Walsh was, in fact, sleeping with clients, or that anyone besides Siupa believed that she was doing so.  See Doc. No. 173-2 at 3-4, 6-7 (Siupa heard the rumor from a doctor who was conveying a rumor he had heard elsewhere, but Siupa did not know whether the rumor was true); cf. id. at 5-6 (Siupa asserted that Walsh once told her she was sleeping with a doctor, but did not know whether the doctor was one of Walsh's clients).  There is no evidence such rumors ever arose or were discussed again after August 2007 (until an April 23, 2009 meeting between Siupa and Johnson).  It bears noting Walsh had received a sales award earlier in 2007 that Siupa has alleged should have been given to her, Doc. No. 43 at ¶ 9, and the defendants have demonstrated Walsh (whose last name was then Morris) exceeded her 2007 quota by the highest percentage margin of any DM in Florida, Doc. No. 167 at 2.

comment to Duke in front of Siupa, accused Siupa of having an affair with another DM, and said Siupa "look[ed] pregnant."[4]  Doc. No. 173 at ¶ 5.  On October 23, 2007, Johnson emailed Siupa to discuss concerns about her behavior at the sales team dinner and her challenges to his authority during the meeting.  Doc. No. 148-9.  Siupa responded the same day with an explanation of her behavior and apologized.  Id.  Two days later, on October 25th, Siupa reported Francis's inappropriate comments to Johnson when they were working together.  Doc. No. 173 at ¶ 6.  Johnson spoke with both Duke and Francis about the comments, but did not report them to anyone in Astra Tech's Human Resources Department, as required under the Policy.  Id. at ¶ 8.  Siupa also did not make a report with Human Resources at the time.  Id.

In late 2007, Uthus set 2008 implant sales quotas for all DMs in all regions by adding a dollar amount (reflecting a desired growth factor) to each DM's actual implant sales from 2007.  Id. at ¶¶ 10-11.  Uthus also set all DMs' quotas for laboratory sales related to products and services provided through a company Astra Tech had acquired in 2007.  Id. at ¶¶ 10, 13.  Various others, including Johnson, may have offered input regarding one or both of the relevant quotas.  Id. at ¶ 10.  The record does not reveal how the growth factor for each DM was determined, but it does show that Siupa's 2008 implant quota was based on an increase over her 2007 actual sales that was neither the largest dollar increase nor the largest percentage increase of the nine DMs her region.  Doc. No. 153 at ¶¶ 8-9.

At a national sales meeting on January 6, 2008, Francis thanked Siupa for "running the bus over" him and told her she "needed to realize who [her] friends were."  Doc. No. 173 at ¶ 14.  Siupa construed his comments as a threat referencing her report to Johnson regarding Francis's

---

[4]No one suggests Johnson heard these comments when they were made.

alleged harassment of her and Duke the previous October.  Id.  During a January 15, 2008 telephone call, Siupa reported Francis's comments to Johnson.[5]  Id. at ¶ 15.  Johnson spoke with Francis about Siupa's complaint and followed up with emails to both Francis and Siupa.  Doc. Nos. 148-12, 148-13.  Thereafter, both Johnson and Siupa brought the matter to Cyr's attention.  Doc. Nos.148-12, 148-13; see Doc. No. 173 at ¶ 16.  Cyr conducted an investigation, including interviews of Siupa, Duke, Francis, and Johnson.  Doc. No. 173 at ¶ 17; see Doc. No. 148-14.  He determined that Siupa's allegations of harassment and related threats by Francis were sustained, and that Johnson had violated the Policy by failing to report the October 2007 incident to Human Resources.  Doc. No. 173 at ¶¶ 17-18.

On January 25, 2008, Cyr issued a written warning to Francis, placing him on probation and requiring his compliance with certain conditions in order to remain employed by Astra Tech.  Id. at ¶ 19; Doc. No. 148-15.  Cyr issued a similar memorandum admonishing Johnson for his failure to alert Human Resources following Siupa's original complaint.  Doc. No. 173 at ¶ 19; Doc. No. 148-16.  He also notified Siupa of the results of his investigation, although he did not go into detail regarding the nature of the actions he took to reprimand those involved.  Doc. No. 163-2 at 15.  Cyr's memorandum to Siupa stated:

> We believe that both of [Francis's] comments were highly inappropriate and unprofessional, and violate our company's Code of Conduct.  Please be assured that we have taken strong measures to prevent such conduct from recurring.  We are persuaded that [Francis] now understands the seriousness of the matter, and that he will refrain from such conduct in the future. . . . We have impressed upon

---

[5]Later that day, Johnson sent an email to all DMs in his region beseeching them to put an end to gossip, to stop comparing their own duties and responsibilities to those of other DMs, and to bring any problems directly to his attention.  Doc. No. 148-11.  Johnson had sent a draft of the same email to Cyr for review the previous afternoon, before he spoke with Siupa about Francis.  See Doc. No. 148-10.  Siupa, however, believed the email was directed at her.  Doc. No. 163-1 at 2.

all involved that you did the right thing by coming to us, and that any form of
retaliation against you will not be tolerated. . . . I also urge you to contact me
immediately if you encounter any further problems.

Id. Following these actions, Siupa was never harassed by Francis again, nor did Johnson or Cyr

learn of any further complaints regarding Francis. Doc. No. 173 at ¶¶ 20-21.

At the same January 2008 national sales meeting, after a DM from the Boston area

removed her bra and handed it to Siupa to hold, Astra Tech's Vice President of Marketing took

the bra and swung it around in a bar. Id. at ¶ 73. Siupa never reported this incident.[6] Id. at ¶ 74.

In February 2008, Uthus and Cyr established objective criteria for when a DM with low

sales should be placed on a performance improvement plan ("PIP"). Id. at ¶ 22. The criteria

called for a ninety-day PIP where: (1) a DM's actual sales for 2007 were less than 70% of their

2007 quota; and (2) his or her actual sales for 2008, to date, were less than 70% of their 2008

quota. Id. Siupa's sales for 2007 were 60% of her 2007 quota, and at the end of February 2008

her 2008 sales were 61% of her year-to-date quota. Id. at ¶ 23. Thus, soon after the new criteria

were announced, Johnson placed Siupa on a PIP. Id. at ¶ 24. At the same time, he placed Gloria

Listorti, another Florida DM who also met the criteria, on a PIP as well. Id. at ¶ 25; see Doc.

No. 148-19; cf. Doc. No. 167 at 2 (showing Siupa and Listorti were the only two DMs in Florida

who satisfied the criteria for a PIP at the end of February 2008). After Siupa's sales improved to

99% of her year-to-date quota by the end of May 2008, she was removed from the PIP. Doc. No.

173 at ¶ 26; Doc. No. 163-2 at 20. Siupa has proffered no evidence showing any other Florida

DM was eligible for a PIP in 2008 but was not placed on one.

---

[6]The Boston DM who owned the bra first reported the incident to Cyr in December 2009,
eight months after Siupa's termination. Doc. No. 173 at ¶ 73. Cyr investigated at that time and
disciplined the Vice President of Marketing. Id. at ¶ 75.

On May 30, 2008, Tenley Hart, another Florida DM, complained to Johnson and then to Anne Dulong (a Human Resources Generalist) that, at a regional sales meeting earlier that month, Siupa had accused Hart in front of a client's representative of having a romantic relationship with Johnson (who was married).  Doc. No. 173 at ¶ 27.  Shortly after Hart's complaint, Renee Waters, a DM from another region, reported to Cyr that Siupa had denigrated a DM from Atlanta in front of other DMs and customers during a training event.  Id. at ¶ 28.  Cyr discussed the allegations with Siupa, who denied having made the comments reported by Hart and Waters.  Id. at ¶¶ 27-29.  The day after he spoke with Siupa, Cyr issued a memorandum regarding the "unprofessional communications," which he sent to Siupa and copied to Johnson, Dulong, and Tony Zablit (the Director of Clinical Sales).  Id. at ¶ 30; Doc. No. 148-21.  The memorandum acknowledged Siupa's denial of the allegations, asked her to take care in her communications with others, but did not impose probation or any other disciplinary measure.[7] Doc. No. 148-21.

In June 2008, Astra Tech held an event called World Congress, attended by clients and its own representatives including Johnson and its president, Scott Root.  Doc. No. 173 at ¶ 31. At the event, Dr. Steve Rimer, a client in Siupa's sales district, expressed concerns about Siupa's behavior and her performance as his sales representative to both Root and Johnson, separately.[8]

---

[7]The memorandum warned Siupa not to confront or question any coworkers whom she believed may have made the reports.  Doc. No. 148-21.  Siupa apparently disregarded that admonishment.  See Doc. No. 148-22; Doc. No. 156 at 12 n.10; see also Doc. No. 148-48 at 27 (admission by Siupa when deposed that she called Waters to ask about what she told Cyr).

[8]Siupa claims "[t]he source of all the stories that Dr. Rimer did not want [her] as his DM was Joe Johnson," based in part on her assertion that Root spoke to her about Dr. Rimer but did not mention his complaints about her.  Doc. No. 173 at ¶ 31.  That fact, however, does not create a dispute where the record reflects contemporaneous emails from Root regarding Dr. Rimer's complaint to him.  See Doc. Nos. 148-24, 148-25.

Id.; see Doc. Nos. 148-24, 148-25; see also Doc. No. 148-52 at 2, 4-5.  Root and Johnson each

reported Dr. Rimer's concerns to Cyr; Zablit and Mike Mancini (Astra Tech's Vice President of

U.S. Sales) were informed as well.  Doc. Nos. 148-24, 148-25.  In communications that followed

among that group, Johnson initially recommended terminating Siupa.  Doc. No. 173 at ¶ 34.

However, both Cyr and Johnson had further discussions with Dr. Rimer, who ultimately agreed

Siupa could continue serving as his sales representative but emphasized the need for her to

"drive his business" and continued to express a desire to work with Walsh, whom he perceived

to be "much more aggressive and knowledgeable."  Id. at ¶ 35; Doc. No. 148-28.  Siupa,

therefore, was not terminated, but Root noted the need for her "to prove to [Dr. Rimer] and to

[Astra Tech] that she can have [a] large positive impact on [Dr. Rimer's] and [Astra Tech's]

business."  Doc. No. 148-28.

In October 2008, Johnson noted concerns about Siupa's responsiveness when she failed

to return a call from him regarding scheduling a client program for nearly a week.  Doc. No. 173

at ¶ 36; Doc. No. 148-29.  After discussing the matter with Siupa via email, on October 13, 2008,

Johnson scheduled a telephone call with Siupa and either Cyr or Dulong.  Doc. No. 173 at ¶ 37.

Siupa rescheduled the call due to vacation plans and asked that Zablit be involved as well.  Id.

The same day, Siupa called Dulong and reported her belief that Johnson and Cyr were treating

her unfairly and retaliating against her for her previous reports of sexual harassment.  Id. at ¶ 38;

---

It is worth noting that this apparently was not the first time Dr. Rimer expressed concern
about Siupa's effectiveness.  See Doc. No. 148-6 (reflecting comments by Dr. Rimer to Johnson
in October 2006 regarding his preference for DM Ellen Walsh and his wish that Siupa would
emulate "her selling style").  Siupa suggests Johnson is "not to be believed" about such matters,
Doc. No. 173 at ¶ 32, but his recounting of the earlier complaint predates the events that Siupa
claims gave rise to his desire to retaliate against her, and she identifies no other basis for
questioning the earlier report.

Doc. No. 148-31.  After speaking with Siupa, Dulong investigated the matter by interviewing both Johnson and Cyr.  Doc. No. 173 at ¶ 39.  Dulong subsequently reported to Siupa that, although she had found no evidence of retaliation, she agreed there was tension between Siupa and Johnson that should be addressed.  Id. at ¶ 40; Doc. No. 148-32.  Cyr followed up with a conference call including Siupa, Johnson, and Zablit, during which guidelines were established for future communications between Siupa and Johnson.  Doc. No. 148-33.

Siupa met her 2008 implant sales quota.  Doc. No. 173 at ¶ 41; Doc. No. 163-5 at 3.  For 2009, Mancini and Zablit created a "standard methodology" for setting both implant and laboratory sales quotas.  Doc. No. 148-34.  They determined that 2009 quotas would be based on each DM's 2008 actual sales, with an added "growth goal" for the new year.  Id.; Doc. No. 173 at ¶ 43.  Implant growth goals were standardized and assigned based on which of five dollar ranges encompassed a DM's 2008 actual sales.  Doc. No. 148-34 at 3; Doc. No. 173 at ¶ 43.  All DMs were assigned the same laboratory growth goal.  Doc. No. 148-34 at 3; Doc. No. 173 at ¶ 45.  Using this methodology, Mancini and Zablit assigned 2009 quotas for each DM nationwide, then notified the RMs of what those quotas were.  Doc. Nos. 148-34, 148-35.  Siupa's 2008 implant sales totaled $334,410, Doc. No. 148-35 at 3, placing her in the "$250k-$499k" bracket and corresponding to a $29,000 growth goal under the new methodology, Doc. No. 148-34 at 3.  Thus, her 2009 implant quota was $363,410.  Doc. No. 148-35 at 3.  Like all other DMs in the country, Siupa was assigned a $33,852 growth goal for laboratory sales, making her 2009 laboratory quota $111,172.  Id. at 4.  Johnson played no role in setting the 2009 quotas.[9]  Doc.

_____

[9]Although Siupa endeavors to dispute this fact, the record contains no evidence suggesting Johnson had any input in determining her 2009 quota.  The record establishes Mancini and Zablit set brackets to dictate growth goals for each DM based on his or her prior year's actual sales, and then used those brackets to objectively calculate the new quotas.  Even if

No. 173 at ¶ 46; Doc. No. 173-6 at 4.

In January 2009, a DM from another region reported to her RM that Siupa had made negative comments about another Florida DM at a recent sales meeting.  Doc. No. 173 at ¶ 47; see Doc. No. 148-36; Doc. No. 148-53 at 18.  Mancini was contacted about the report, and he informed Cyr, Zablit, and Root, reminding them of Siupa's prior warning about making such comments after similar reports by Hart and Waters in 2008.  Doc. No. 148-36.  Cyr ultimately spoke with Siupa about the comments.[10]  Doc. No. 173 at ¶ 48.

In February, March, and the first half of April 2009, Siupa's sales were dramatically below her monthly quotas.  Doc. No. 173 at ¶¶ 50-51.  Mancini characterized her numbers as "abysmal."  Doc. No. 148-53 at 13.  Johnson arranged to meet with Siupa on April 23, 2009 to work on her business plan.  Doc. No. 173 at ¶ 52.  During the meeting, Siupa questioned how her quota had been set, claiming it was unfair compared to other DMs in the region.  Doc. No. 173 at ¶ 53.  Johnson explained the methodology used to set the quotas, but Siupa perceived that he became angry in doing so.  Id.  According to Siupa, at some point during this conversation Johnson suggested that she could improve her sales "by adopting the selling methods and style of Ellen Walsh," referring to Siupa's 2007 report that Walsh was rumored to be sleeping with clients.[11]  Doc. No. 163-1 at 5.  Also at the meeting, Siupa told Johnson that she planned to

———————————————

they had provided the brackets to the RMs and asked them to apply the brackets to their DMs – which the record shows they did not do, Doc. No. 148-35 – Siupa has not suggested that her 2008 sales actually fell into a different bracket, or that she was assigned a growth factor other than the one set forth in the standard methodology for the bracket containing her 2008 sales.

[10]According to Siupa, she did give her opinion that the other Florida DM was not performing effectively, but denies that she "bad-mouthed" him.  Doc. No. 173 at ¶ 47.

[11]Tellingly, Siupa described the April 23, 2009 meeting but did not include this alleged comment by Johnson – the anchor with which Siupa seeks to secure all other allegations of

attend a "study club" hosted by Dr. Rimer the following day, although she questioned the

usefulness of it based on concerns that Dr. Rimer was promoting a competitor's products.  Doc.

No. 173 at ¶¶ 54-55.  Johnson noted her concerns were reasonable, but advised that she could

use the study club as an opportunity to network with other potential customers in attendance.  Id.

at ¶ 55.

Just before 11:00 p.m. on April 23rd, Siupa emailed Johnson regarding a medical

appointment she "didn't realize" she had the next morning, and asked him how to request "2-3

hours" off.[12]  Id. at ¶ 56.  Her email did not mention Dr. Rimer's study club.  Id.  Johnson

responded and instructed her to enter the time as "sick time" on Astra Tech's employee leave

system.  Id. at ¶ 57.  Siupa did so, entering four hours of sick time for the morning of Friday,

April 24, 2009.  Id. at ¶ 59.  She did not attend the study club, nor did she contact Johnson to tell

him she had missed it.  Id. at ¶¶ 58, 60; see Doc. No. 148-43 at 5 (showing Johnson sent a text

---

harassment within the relevant statute of limitations – in her state administrative filings, her
original and amended complaints in this action, and her first three sets of responses to the
defendants' interrogatories.  See Doc. No. 1-1 at ¶ 30; Doc. No. 43 at ¶ 30; Doc. No. 148-45 at 4;
Doc. No. 148-46 at 2-10.  She first mentioned it in her third supplemental interrogatory
responses, dated October 11, 2012.  Doc. No. 148-47 at 6-7.  The record before the Court
contains no explanation for this late disclosure, which has exhaustion and statute of limitations
implications that will be addressed below.  It also raises legitimate questions regarding Siupa's
truthfulness under oath, at least with respect to this assertion, but such questions are for jurors to
resolve after trial.  Siupa's latest testimony governs for purposes of summary judgment.

[12]During her deposition, Siupa admitted the statements in her email to Johnson were
untrue – she had received no reminder about a medical appointment and, in fact, had no "formal"
appointment scheduled.  Doc. No. 148-48 at 8-9.  Nevertheless, Siupa claimed she was suffering
from "excruciating pain" and experiencing a miscarriage, and that a doctor she had seen on April
23rd had asked her to return the following morning for that reason.  Id.  Her personal doctor,
however, has testified that Siupa's April 23rd appointment was a routine annual checkup, no
complaints of pain were noted, no bleeding was observed, no pregnancy or miscarriage was
documented, and no follow-up appointment was scheduled.  Doc. No. 148-56.  In ruling on the
pending motion, the Court accepts Siupa's account.

message to Siupa late in the morning on April 24th reminding her to attend the study club after her medical appointment, and only learned she had missed the event when Walsh, who had attended the study club, texted Johnson that afternoon to say the event had ended and Siupa had never arrived).

The following Monday and Tuesday, a series of conversations among Johnson, Cyr, Mancini, and Zablit took place addressing concerns about Siupa and contemplating termination. Id. at ¶¶ 62-63; Doc. No. 148-40.  On the morning of Wednesday, April 29, 2009, Cyr contacted Siupa to discuss her performance and her failure to attend the study club.  Doc. No. 173 at ¶ 64; see Doc. No. 148-41.  Later that day, with the agreement of Mancini, Zablit, and Johnson, Cyr called Siupa again and fired her.  Doc. No. 173 at ¶¶ 65-66.  According to Siupa, Cyr cited two reasons for her termination during the telephone call: low sales in 2009, and her conversation with Johnson about quotas on April 23, 2009.  Id. at ¶ 66.  The next day, Siupa requested additional information from Cyr, and in his email response he listed the following reasons for her termination: 1) "not showing up for an important meeting with a doctor, and failing to notify [her] manager or co-worker"; 2) "not performing at an acceptable level"; 3) "not appearing to be focused on [her] job"; 4) "disruptive communications in the workplace"; and 5) "the fact that [she had] previously received two written warnings."  Doc. No. 148-42 at 1; Doc. No. 173 at ¶ 68.[13]

Siupa filed a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD") on August 11, 2009.  Doc. No. 148-45.  In February 2010, Siupa

---

[13]Although Siupa construes this as a "change" in the reasons given, Doc. No. 173 at ¶ 68, the Court sees no meaningful difference between the two reasons Siupa describes after Cyr's call and the second and third reasons listed in his subsequent email.

instituted this action in state court, and the defendants removed it to this Court a month later.

Doc. Nos. 1, 1-1.  Siupa alleges four causes of action: 1) "Hostile Working Environment/Sexual

Discrimination and Sexual Harassment Against All Defendants" under federal and state law; 2)

"Unlawful Retaliation and Retaliatory Discharge from Employment Against All Defendants"

under Massachusetts law; 3) "Intentional Infliction of Emotional Distress Against All

Defendants"; and 4) "Wages Owed Against Defendant Astra-Tech, Inc."  Doc. No. 43.  The

defendants have sought summary judgment with respect to all of Siupa's claims, and they are

entitled to it for the reasons that follow.

II.    <u>MOTION TO STRIKE</u>

As a preliminary matter, the defendants have moved to strike dozens of excerpts from the

affidavits submitted by Siupa in opposition to the motion for summary judgment.  Doc. No. 165.

According to the defendants, those affidavits, signed by Siupa and Duke, contain a laundry list of

statements that either are not based on personal knowledge; constitute arguments, conclusions, or

personal opinions; or are based on hearsay.  <u>Id.</u>  Siupa has opposed the motion.  Doc. No. 174.

In many instances, however, Siupa's opposition all but concedes the objectionable nature of the

passages identified by the defendants.  Upon review of the parties' submissions, the motion to

strike is ALLOWED in part and DENIED in part as follows.

The most straightforward category of statements at issue in the motion to strike is

hearsay, which cannot be relied upon to defeat summary judgment.  <u>See</u> <u>Hannon v. Beard</u>, 645

F.3d 45, 49 (1st Cir. 2011) (statements in a plaintiff's affidavit "about what he was told" are

properly disregarded as inadmissible hearsay and cannot create a genuine issue of material fact).

The defendants have identified three statements in Siupa's affidavit and two in Duke's which

appear on their face to be hearsay.  <u>See</u> Doc. No. 165 at 4 (listing comments setting forth facts which some other person "told" the affiant).  In her opposition, Siupa essentially admits the basis for the statements is hearsay.  <u>See</u> Doc. No. 174 at 5 (explaining the basis for Siupa's comments is information provided in Duke's affidavit, and asserting Duke "has no reason to disbelieve what Siupa told her").  These five statements will be stricken.

Similar problems exist with respect to many of the statements the defendants have listed under the heading "Lack of Personal Knowledge."  <u>See</u> Doc. No. 165 at 1-2.  Siupa admits the basis for three of the statements in this category was information told to her by other individuals. Doc. No. 174 at 1-2 (responses numbered 2, 7, and 14).  As to nine other statements in this grouping, Siupa's "personal knowledge" is derived from her review of various documents provided by the defendants during discovery, as well as the transcripts of deposition testimony by the defendants and other representatives of Astra Tech, and the inferences she has drawn therefrom.  <u>Id.</u> (responses numbered 4-6 and 8-13).  Assertions recounting information learned by an affiant through documents she has read are no less hearsay – and no more admissible – than assertions recounting information told to the affiant by a third party.[14]  <u>See</u> Fed. R. Evid. 801(a) (defining "statement" for hearsay purposes to include a "written assertion").  As such, these twelve excerpts are stricken.[15]

---

[14]Here, the sources upon which Siupa relies were not used to refresh her recollection about events she personally experienced, but provided information about conversations to which she was not a party.  The documents and deposition excerpts themselves are part of the record here and the Court has considered them.

[15]Siupa's opposition contains no response to the sixth excerpt listed by the defendants in this section: from paragraph 20 of her affidavit, the phrase "for whom Johnson had arranged a transfer from Florida to Massachusetts."  Doc. No. 165 at 2.  Because the record is devoid of evidence showing Johnson arranged Hart's transfer, because Siupa has not explained the basis for her personal knowledge in this regard, and because the fact itself is not material, the excerpt

The two remaining excerpts in the "Lack of Personal Knowledge" category are assertions explicitly made based on "information and belief."  Doc. No. 163-1 at 1, 3.  Such statements do not satisfy the requirements of Rule 56(c)(4).  <u>Sheinkopf v. Stone</u>, 927 F.2d 1259, 1271 (1st Cir. 1991); <u>Murphy v. Ford Motor Co.</u>, 170 F.R.D. 82, 84-85 (D. Mass. 1997).  To the extent the two paragraphs at issue include information conveyed in written documents that are part of the record, the Court will consider those documents.[16]  The statements in the affidavit, however, are stricken.

More difficult questions arise in connection with certain excerpts identified by the defendants as "Argument, Conclusory Assertion, and Opinion."  <u>See</u> Doc. No. 165 at 3-4.  A party may not avoid summary judgment by reliance on her own argument, legal conclusions, or other such conclusory assertions.  <u>Murphy</u>, 170 F.R.D. at 85; <u>cf.</u> Fed. R. Civ. P. 56(c)(4) (limiting affidavits to "facts that would be admissible in evidence").  Consistent with this principle, Siupa may not rely upon her own interpretation of the law or the legal conclusions she wishes the Court to draw from the facts at hand.  As such, the Court will strike and disregard statements in her affidavit regarding what is "required . . . by Massachusetts law," and whether certain conduct amounts to "sexual harassment" or constitutes "retaliation."  <u>See</u> Doc. No. 165 at 3-4 (listing such excerpts from paragraphs 5, 8, 9, 12, 13, 14, 17, 19, 22, and 26 of Siupa's

---

will be stricken.  <u>See</u> Fed. R. Civ. P. 56(c)(4) (requiring affidavits to "show that the affiant . . . is competent to testify on the matters stated").

[16]Siupa claims the objectionable portion of paragraph 15 is based on Cyr's memorandum to her summarizing his investigation in January 2008.  Doc. No. 174 at 1 (response number 3).  That document speaks for itself.  As to the objectionable portion of paragraph 5, Siupa's explanation does not make sense.  The paragraph relates to inappropriate comments allegedly made by Mike Cochrane and reported to Johnson by Duke.  Doc. No. 163-1 at 1.  Siupa's response addresses her complaint about Pat Francis.  Doc. No. 174 at 1 (response number 1).

affidavit, and paragraphs 12 and 22 of Duke's affidavit).[17]

Other excerpts contained under this heading are problematic as well. For example, several paragraphs set forth Siupa's conclusions and speculation regarding the motivations of the defendants. See Doc. No 163-1 at 3-6 (surmising the defendants "hop[ed she] would quit [her] job," aimed to "driv[e her] out of the company," "attempt[ed] to drive [her] to resign," "plan[ned] to terminate [her] on pretextual grounds," and "contrived reasons why [she] was terminated"). Although she may properly attest to the facts from which she drew these conclusions, it is for the factfinder, not Siupa, to determine whether such conclusions are warranted based on the facts. In addition, Siupa's characterization of Francis as a "friend" or "close friend" of Johnson is neither supported by the record nor by Siupa's explanation for her characterization. See Doc. No. 165 at 3 (citing excerpts from paragraphs 14 and 20 of Siupa's affidavit); Doc. No. 174 at 3 (explaining in response number 24 that it was "well known" that Johnson and Francis previously had worked together at another company, and that Johnson had played a role in hiring Francis at Astra Tech – facts which merely demonstrate a professional relationship). The motion to strike is allowed with respect to each of these conclusory assertions.

The remaining excerpts in this category, however, generally convey Siupa's feelings and perception of certain events. E.g., Doc. No. 163-1 at 2, 5 (describing a perceived change in Johnson's treatment of her, her belief a memorandum was directed at her, and Johnson's

---

[17]To the extent that these paragraphs also contain factual allegations, the Court has considered them (setting aside only the inappropriate legal conclusions and characterizations). See, e.g., Doc. No. 163-1 at 2 (having stricken the characterization of Francis's comments as "threats" and "sexual harassment," what remains describes the date on which Siupa reported the relevant comments to Johnson and the manner in which Siupa characterized the comments when making her reports).

demeanor during a conversation with her).  Although the relevant question is how a reasonable person in Siupa's position would have perceived such events, she is not barred from offering testimony about her own subjective response to those events.  In this respect, the motion to strike is denied.

III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once a party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); accord Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995).  The Court is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  Even so, the Court must ignore "conclusory allegations, improbable inferences, and unsupported speculation."  Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009).

"There must be sufficient evidence favoring the nonmoving party for a [factfinder] to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50.  "Trialworthiness requires not only a 'genuine' issue but also an issue that involves a 'material' fact."  Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995).  A material fact is one which has the "potential to affect the outcome of the suit under applicable law."

<u>Nereida-Gonzalez v. Tirado-Delgado</u>, 990 F.2d 701, 703 (1st Cir. 1993).  For a factual dispute to
be "genuine," the "evidence relevant to the issue, viewed in the light most flattering to the party
opposing the motion, must be sufficiently open-ended to permit a rational factfinder to resolve
the issue in favor of either side."  <u>Nat'l Amusements, Inc.,</u> 43 F.3d at 735 (internal citation
omitted).

IV.   <u>DISCUSSION</u>

    A.   <u>Count I – Hostile Work Environment</u>

The defendants first contend Siupa's sexual harassment claim is untimely, arguing that
she alleges no "acts that constitute, or could constitute sexual harassment she personally
experienced" within the 300 days leading up to her MCAD filing.  Doc. No. 156 at 20-24.  Siupa
relies on her allegation that Johnson implied she should sleep with clients to gain business during
her April 23, 2009 meeting with him, and suggests all earlier acts of harassment she alleges were
part of a "continuing violation."  Doc. No. 163 at 10-14.

Sexual harassment claims brought in Massachusetts must be filed with state and federal
agencies within 300 days after the alleged act of discrimination.  42 U.S.C. § 2000e-5(e)(1);
Mass. Gen. Laws ch. 151B, § 5.  Siupa filed her MCAD charge on August 11, 2009.  Doc. No.
148-45.  As such, claims based on conduct occurring before October 15, 2008 are time-barred
unless they are part of the same hostile work environment or ongoing violation continuing
beyond that date.  <u>See</u> <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 115-18 (2002);
<u>Windross v. Barton Protective Servs., Inc.</u>, 586 F.3d 98, 102-03 (1st Cir. 2009).  To establish a
continuing violation, Siupa "must prove that (1) at least one discriminatory act occurred within
the limitations period, (2) the alleged timely discriminatory act has a substantial relationship to

the alleged untimely discriminatory act, and (3) the otherwise time-barred events did not trigger [her] 'awareness and duty' to assert [her] rights." Id. at 103 (citing Ocean Spray Cranberries, Inc. v. Mass. Comm'n Against Discrimination, 808 N.E.2d 257, 265 (Mass. 2004)).

Plainly, Johnson's April 23, 2009 comment about Siupa's selling style, assuming he made it with the implied meaning Siupa gives it, falls within the limitations period.  It does not, however, render claims arising from Siupa's other allegations of harassment timely.  No reasonable factfinder could conclude that Johnson's alleged comment was part of the same hostile working environment – or the same series of discrete violations – as the conduct Siupa describes from 2007 and early 2008.  First, the previous conduct that Siupa claims constituted sexual harassment involved various other actors (not Johnson), and took place at company-wide sales meetings and other similar functions involving social as well as business elements (not in a one-on-one business meeting).[18]  Second, the last instance of sexual harassment that Siupa describes before her April 2009 meeting with Johnson occurred fifteen months earlier, in January 2008.  Doc. No. 148-47 at 5-6.

Finally, Astra Tech's intervening action in January 2008 – Cyr's investigation of Siupa's complaints, the discipline imposed as a result thereof, and his memorandum to Siupa sustaining

---

[18]Serious questions exist regarding whether the conduct alleged by Siupa before October 2008 was sufficient to establish a hostile work environment claim, as it was primarily comprised of a number of discrete acts undertaken by different individuals at company-wide conferences occurring in different locations separated by significant amounts of time.  See Doc. No. 156 at 20-21 (listing all conduct identified by Siupa as arguably related to her discrimination claim, much of which is not referenced at all in Siupa's own submissions).  Similar conduct might be viewed differently had it occurred in more rapid succession in a typical office setting with individuals Siupa saw on a daily basis.  In addition, it is difficult to imagine how at least some of the discrete acts objectively would constitute harassment by the named defendants.  See id. (listing incidents such as Siupa being asked to dinner by a client on behalf of another doctor, witnessing two other DMs "making out" in a bar after a company meeting, and not receiving a sales award given to another woman).

her allegations and assuring her action had been taken – further signaled the end of the original hostile work environment to which Siupa claims she was subjected.  See Morgan, 536 U.S. at 118 (acts separated by time might not constitute one hostile work environment where they "had no relation" to one another or where the employer took "intervening action"); Windross, 586 F.3d at 103 (requiring a substantial relationship between the timely and untimely acts of discrimination).  Although Siupa describes conduct between January 2008 and April 2009 which she alleges was retaliatory, such conduct does not revive her sexual harassment or hostile work environment claim.  See Noviello v. City of Boston, 398 F.3d 76, 87 (1st Cir. 2005) (timely acts arising from allegedly retaliatory animus do not save time-barred acts arising from allegedly sexual animus).

Accordingly, the first count in Siupa's amended complaint survives only to the extent that the April 23, 2009 comment by Johnson – the single timely act that allegedly constituted sexual harassment – can independently support the claim.  This it cannot do.

The theory of sexual discrimination pursued by Siupa throughout this action has been that she was subjected to a hostile working environment, not that any one discrete act of sexual harassment amounted to actionable discrimination on its own.  See Doc. No. 148-45 at 4 (describing, in Siupa's MCAD charge, a hostile working environment).  To prove such a claim, Siupa must demonstrate harassment "so severe or pervasive that it altered the conditions of her work and created an abusive work environment."  McDonough v. Donahoe, 673 F.3d 41, 46 (1st Cir. 2012).  "[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).  Johnson's solitary comment to Siupa about her selling style and its

alleged implication (which depends on a link to a complaint Siupa made nearly two years earlier about a rumor she had heard) does not constitute severe or pervasive harassment.

To the extent Siupa alternatively wishes to pursue her sexual discrimination claim based on Johnson's alleged comment under a theory other than hostile work environment (i.e., a claim that the comment itself was harassment that resulted in a tangible employment action against her, see Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 43-44 (1st Cir. 2003)), she may not do so.  First, she has waived any such claim by failing to present it in these terms in either her briefing or during oral argument on this motion.  See generally Doc. No. 163.  Second, she has not administratively exhausted such a claim here, as her MCAD charge described a hostile work environment and subsequent retaliation following Siupa's report thereof, characterized Johnson as a "retaliator" and not a "harasser," and contained no reference to his allegedly harassing comment despite the fact that it did describe other aspects of the April 23, 2009 meeting.  Doc. No. 148-45 at 4; see Fantini v. Salem State Coll., 557 F.3d 22, 26-27 (1st Cir. 2009) (limiting a civil complaint to the scope of the administrative charge "and the investigation which can reasonably be expected to grow" from it); Everett v. 357 Corp., 904 N.E.2d 733, 747-52 (Mass. 2009) (limiting civil complaint to claims that are "reasonably related," "both factually and as a matter of law," to allegations in MCAD charge).  Third, the only tangible employment action Siupa claims to have suffered after the April 2009 comment was her termination, which she has consistently alleged was retaliatory but has never alleged was discriminatory.

Under these circumstances, the defendants are entitled to judgment as a matter of law with respect to Count I.

B.      Count II – Retaliation

Next, the defendants argue Siupa has neither stated a prima facie claim of retaliation nor rebutted the legitimate reasons offered by the defendants for her termination.  Doc. No. 156 at 25-34.  Even assuming Siupa has met her initial burden under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the record here would not permit a reasonable jury to conclude that the non-retaliatory reasons identified by the defendants as justifications for Siupa's termination were pretext.

Both federal and state law prohibit employers from discriminating against employees who have made allegations of discrimination.  42 U.S.C. § 2000e-3(a); Mass. Gen. Laws ch. 151B, § 4(4), (4A).  The McDonnell Douglas burden-shifting framework, which applies to retaliation claims, first requires a plaintiff to show "she engaged in protected activity" and "suffered an adverse employment action" that "was causally connected to the protected activity." Gerald v. Univ. of P.R., 707 F.3d 7, 24 (1st Cir. 2013).  If the plaintiff meets this burden, the defendant must then "articulate a legitimate, non-retaliatory reason for its employment decision." Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 46 (1st Cir. 2010).  Once the defendant has done so, the burden returns to the plaintiff "to show that the reason is pretext and that retaliatory animus was the real motivating factor." Gerald, 707 F.3d at 24.  Although Massachusetts law regarding pretext is more generous to plaintiffs, it still requires a showing that one or more of the employer's proffered reasons are false.  Lipchitz v. Raytheon Co., 750 N.E.2d 360, 368 (Mass. 2001).

Siupa clearly has established the first two elements of the prima facie showing required under the burden-shifting framework: she engaged in protected activity when she reported

Francis's comments to Johnson in October 2007 and then to Cyr in January 2008, and also when she reported to Dulong in October 2008 her belief that Johnson and Cyr were retaliating against her; and she suffered an adverse employment action when she was terminated in April 2009.[19] The third element is a closer question, as at least six months separated her last protected activity and her termination.  Clearly, a tight temporal connection, such as several hours or even two weeks, may establish causation.  See Harrington v. Aggregate Indus. Ne. Region, Inc., 668 F.3d 25, 32 (1st Cir. 2012); Collazo, 617 F.3d at 49.  Six months is not so long as to preclude causation when the subject of the complaint (here, Johnson and, later, also Cyr) participated in the alleged retaliation (here, the decision to terminate Siupa), but such a time frame may create doubt regarding the existence of a causal connection.  See Lukacinsky v. Panasonic Serv. Co., No. 03-40141, 2004 WL 2915347, at *26 (D. Mass. Nov. 29, 2004).  Here, the doubt is enhanced because the original complaint was investigated and fully sustained by one of the alleged retaliators, and Francis engaged in no further harassment thereafter.  Nonetheless, given the "relatively light burden" Siupa faces here, see DeCaire v. Mukasey, 530 F.3d 1, 19 (1st Cir. 2008), the Court will assume – perhaps generously – that a reasonable jury could find a causal connection between her complaints and her termination for prima facie purposes.

The defendants, however, easily have satisfied their burden at the second stage of the

---

[19]Siupa originally alleged that other actions were retaliatory as well, including her March 2008 PIP, Johnson's contacts with one of her customers in June 2008, the June 2008 memorandum from Cyr about unprofessional communications, the handling of the June 2008 complaint by Dr. Rimer about her performance, and the setting of her 2009 quota.  See Doc. No. 43 at ¶¶ 20-28, 38.  She appears to have abandoned that position in her brief, instead arguing only that such conduct demonstrates the pretextual nature of the defendants' reasons for terminating her.  Doc. No. 163 at 14-17.  This is perhaps based on her recognition that a retaliation claim stemming from any of the 2008 acts would be time-barred, see § IV(A) supra, and there is no evidence Johnson or Cyr (the alleged retaliators) were involved in setting her 2009 quota.

McDonnell Douglas analysis.  From the time of her termination, they have cited at least five legitimate, non-retaliatory reasons which cumulatively justified their decision.  See Doc. No. 148-42 at 1.  Each of those reasons is amply supported by the record before the Court:

- Siupa did miss Dr. Rimer's study club on April 24, 2009 after telling Johnson she would attend it, and her email to Johnson requesting two or three hours of sick time that day did not specify that she would miss any (let alone all) of the event. See Doc. No. 173 at ¶¶ 54-56.  Johnson's expectation that she still would attend the study club is reflected in his text message to her on the morning of the event instructing her to do so.  See Doc. No. 148-43 at 5.

- Siupa's sales were admittedly – and significantly – below quota for the two-and-one-half months prior to her termination, and it was not the first time in her tenure at Astra Tech that her low sales had been a concern.  See Doc. No. 173 at ¶¶ 23, 50-51; see also Doc. No. 148-7.

- During a meeting intended to focus on improving Siupa's sales, she instead questioned the fairness of her quotas and did so based on information she had collected about the sales and quotas of other DMs in her region – a topic that Johnson had previously discussed with her at least once.  See Doc. No. 148-39 at 2; Doc. No. 148-40 at 1-2; cf. Doc. No. 148-2 at 2 (reflecting concerns that Siupa was questioning territory assignments impacting other DMs and not related to her own duties).  Her preoccupation with quota setting at a time when her performance was in need of improvement reasonably could have led her superiors to question whether she was appropriately focused on her duties.

- On at least three occasions, other Astra Tech employees complained about Siupa's comments and behavior at company events. Doc. No. 173 at ¶¶ 27-28, 47; see also id. at ¶ 31 (showing Dr. Rimer also complained about Siupa's performance and behavior); cf. Doc. No. 148-5 (reflecting an employee complaint regarding Siupa's behavior at 2006 sales meeting). Although Siupa challenges the substance of and motivation for the complaints, she does not dispute the fact that the complaints were made, and she has offered no evidence even remotely suggesting that Johnson solicited the complaints. The final complaint by a co-worker concerned behavior occurring after Siupa had been warned about such conduct. See Doc. No. 173 at ¶¶ 29-30, 47.

- Finally, Siupa already had received formal written warnings regarding both her performance (in the form of the March 2008 PIP) and her behavior (via Cyr's June 2008 memorandum). Id. at ¶¶ 24, 30. Those were in addition to other less formal warnings, either orally or via email. E.g., Doc. No. 148-5.

It bears noting that several of the reasons given are supported by evidence that such concerns first arose before Siupa engaged in any protected activity, and before the events that allegedly motivated Johnson and Cyr to retaliate against her. In light of the defendants' reasons and the supporting evidence thereof, the burden shifts back to Siupa to demonstrate pretext.

Siupa suggests she has offered "more than sufficient evidence to rebut" the defendants' stated reasons, but her "evidence" of pretext is comprised entirely of her own speculation and innuendo, which is inadmissible and cannot defeat summary judgment. See Hannon, 645 F.3d at 48 ("Conclusory allegations and rank speculation, even if couched in pejorative language, will

26

not suffice to defeat a properly supported summary judgment motion."). Specifically, Siupa

points to a series of events which she characterizes as "repeated attempts to terminate" her,

starting with her March 2008 PIP. Doc. No. 163 at 15-17. The PIP was instituted just over one

month after Johnson was reprimanded by Cyr based on Siupa's complaint. However, any

inference of retaliation that might arise from that timing is undermined by the fact that the PIP

came only days after new, objective criteria were established for implementing PIPs (by

individuals other than Johnson). In addition, the defendants have offered evidence establishing

that Siupa and Listorti were the only two DMs in the Florida region Johnson placed on PIPs at

that time because they were the only two who fit the new, objective criteria. Siupa has offered

no evidence showing that she did not meet the criteria, that other DMs who also met the criteria

were not placed on PIPs, or that the criteria were created to punish her. Moreover, when Siupa's

sales improved, Johnson removed her from the PIP. There is simply nothing in the record to

support Siupa's belief that the PIP was "the first step in [a] pretext termination." Id. at 15.

    Next, Siupa points to Cyr's June 2008 investigation into complaints about her behavior

and the resulting memorandum admonishing her about her interactions with her co-workers. Id.

at 15-16. She characterizes this as an "effort to terminate her," but the record contains no

evidence showing that anyone at Astra Tech discussed terminating her at that juncture.

Although the written warning she received stated that any future "unprofessional

communications" similar to those outlined in the memorandum could subject her "to disciplinary

action, including termination," Doc. No. 48-21, such language does not transform the

investigation into an effort to fire her, nor does anything in the record suggest the investigation

was undertaken in a retaliatory or otherwise unfair fashion.[20]

The third incident Siupa identifies as evidence of pretext involves Dr. Rimer's complaints about her in June 2008. Doc. No. 163 at 16. She implies Johnson and Cyr somehow fabricated the complaints and then were thwarted when Dr. Rimer did not confirm them. Id. The record, however, contains a series of contemporaneous emails showing both Root and Johnson conveyed Dr. Rimer's complaints to Cyr (on separate occasions, with Root informing Cyr first), that termination of Siupa was discussed, but that efforts were undertaken to clarify the details of the complaints with Dr. Rimer directly. Doc. Nos. 148-24, 148-25, 148-26, 148-27, 148-28. During those efforts, Cyr questioned whether the conduct at issue had occurred before or after Siupa's recent warning, and Johnson assured him it likely predated the memorandum (i.e., that she had not persisted in such behavior after being warned not to do so). Doc. No. 148-26. Moreover, Dr. Rimer's agreement to continue working with Siupa (despite his reservations, and with stipulations that she adopt more aggressive efforts to "drive his business") came only as a result of a conversation between Dr. Rimer and Johnson. Doc. No. 148-28. This evidence, which Siupa has countered with nothing more than her own opinion that Johnson is not to be trusted, "is more consistent with an employer's longstanding desire to improve an employee's behavior [and performance] than with some sort of vengeful preoccupation." Mesnick v. Gen.

---

[20]Siupa speculates, without a shred of evidentiary support, that Johnson somehow solicited the complaints made about her. Doc. No. 163-1 at 4; see Doc. No. 173 at ¶ 28 (noting Johnson "does not even know" one of the individuals who complained). Further, her counsel suggested during oral argument that Cyr's investigation was faulty because he did not speak with Siupa about the allegations, a suggestion that is belied by the warning memorandum itself. Doc. No. 148-21. Siupa also claims, without citation, that Johnson "admitted" that this "was the first time he recommended that [Siupa] be terminated." Doc. No. 163 at 16. It appears from the record, however, that the first termination recommendation from Johnson was a short time later, in response to Dr. Rimer's complaints. See Doc. No. 148-25.

Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991).

The remaining facts Siupa cites as evidence of pretext are of marginal relevance, and are certainly insufficient – considered alone, or together with the events already discussed – to permit a reasonable jury to question the legitimacy of the defendants' non-retaliatory reasons for firing Siupa.  See Doc. No. 163 at 16-17 (citing a comment by Zablit in his 2008 performance review of Johnson referring to a "red circle" of gossip and negativity in the Florida region perpetuated by DMs including Siupa, which Siupa claims was based solely on information Zablit received from Johnson; the fact that Johnson notified Hart of Siupa's termination immediately after it occurred; and Duke's claim that Johnson bragged to her about Siupa's termination and threatened that she "would be next").

Accordingly, after carefully reviewing the record, the Court concludes Siupa has failed to adduce any evidence demonstrating that any of the defendants' stated reasons were false or otherwise raising a genuine factual dispute regarding her ability to satisfy the third prong of the McDonnell Douglas test, even under the more lenient Massachusetts standard.  The defendants, therefore, are entitled to summary judgment with respect to Count II of the amended complaint.

C.      Counts III and IV

In the remaining two counts, Siupa alleged claims of intentional infliction of emotional distress and "wages owed."  Doc. No. 43 at ¶¶ 40-49.  In June 2013, Siupa filed a notice of her intent to voluntarily dismiss her "wages owed" claim.  Doc. No. 144.  As such, Count IV is hereby DISMISSED with prejudice.

The defendants have sought summary judgment with respect to Siupa's intentional infliction of emotional distress claim, arguing that it is barred by the Massachusetts Workers'

Compensation Act and, in the alternative, that Siupa has established neither conduct that is sufficiently outrageous nor harm that is sufficiently extreme.  <u>See</u> Doc. No. 156 at 35-43. Siupa's brief is silent on these issues, and her counsel confirmed during oral argument that she does not oppose the defendants' motion with respect to this claim.  Accordingly, summary judgment is appropriate as to Count III as well.

V.     <u>CONCLUSION</u>

For the foregoing reasons, the defendants are entitled to entry of judgment as a matter of law with respect to all of Siupa's claims.  Their motion for summary judgment is, therefore, ALLOWED.  A separate judgment will enter.

SO ORDERED.

_____/s / Leo T. Sorokin_____
Leo T. Sorokin
Chief U.S. Magistrate Judge